USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: Mar 22, 2013

-------------------------------------------------------------------X
:
DIERDRE JOHNSON,                            :
     *on behalf of A.J., a minor*,          :
                                  :
                    Plaintiff,     :            11 Civ. 5247 (JMF)
                                  :
         -v-                   :         OPINION AND ORDER
                                  :
MICHAEL J. ASTRUE,              :
     *Commissioner Social Security Administration*,  :
                                  :
                    Defendant.    :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Plaintiff brings this action on behalf of her daughter A.J., a minor, pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g) and 1383(c), seeking review of the final administrative decision by the Commissioner of Social Security (the "Commissioner") that A.J. is "not disabled" within the meaning of the Act and therefore not entitled to childhood Supplementary Security Income ("SSI") disability benefits. The parties have cross moved for judgment on the pleadings. Because the Administrative Law Judge ("ALJ") applied correct legal principles and there was substantial evidence in the record to support his decision, Johnson's motion is denied and the Commissioner's motion is granted.

## THE STATUTORY SCHEME

Children from low-income families may receive SSI benefits under Title XVI of the Act if the child's income and assets do not exceed a certain amount and if the child qualifies as "disabled" under the Act. *See* 42 U.S.C. § 1382(a)(1). A child under the age of 18 is considered disabled if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner employs a multi-step "sequential evaluation process" to determine whether a child meets this definition. 20 C.F.R. § 416.924. At the first step, the Commissioner inquires whether the child is doing "substantial gainful activity." If so, the claim is denied; if not, the claim proceeds to the second step. *See* 20 C.F.R. §§ 416.924(a), (b). At the second step, the Commissioner screens out de minimis claims in which the child does not have a severe impairment. 20 C.F.R. § 416.924(c). Finally, at the third step, the Commissioner determines whether the child has an impairment or combination of impairments that "meet, medically equal, or functionally equal" a listed impairment as specified at 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d). If so, the claim is accepted; if not, it is denied. *See id.*

To qualify as disabled, therefore, a child must present specified medical findings to show that the effects of the child's impairment are sufficiently severe. *See* 20 C.F.R. §§ 416.924(c), (d). If the impairment is sufficiently severe, but does not "meet" a listed impairment, the child can qualify as disabled if she presents medical findings of "equal medical significance" to a listed impairment. 20 C.F.R. § 416.926(b)(1)(ii). In such a case, she will be said to "medically equal" the listing. 20 C.F.R. § 416.926(c). If the child neither "meets" nor "medically equals" a listing, however, she can still qualify for SSI benefits if her impairment "functionally equals" the severity of a listed impairment. 20 C.F.R. §§ 416.924(d), 416.926a.

In considering functional equivalence, the Commissioner looks at the child from the perspective of how the child's impairments affect "broad areas of functioning" known as "domains." 20 C.F.R. § 416.926a(b)(1). Children are evaluated in 6 domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with

others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." *Id.* For each domain, the Commissioner determines whether the degree of limitation, if any, qualifies as "marked," or "extreme." 20 C.F.R. §§ 416.926a(d), (e). A "marked" limitation is one that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). A child is deemed disabled if she has an extreme limitation in at least 1 domain or marked limitations in 2 or more domains. *See* 20 C.F.R. § 416.926a(d).

Where IQ or other "comprehensive standardized test[s] designed to measure ability or functioning in [a particular domain]" are used, a marked limitation is shown if the child scores between 2 and 3 standard deviations below the test's norm "and [the child's] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(iii). An extreme limitation is shown by a test score of at least 3 standard deviations below the norm where "[the child's] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(3)(iii). Significantly, the Commissioner does not rely on test scores alone when making a disability determination, and "[n]o single piece of information taken in isolation can establish whether [a child has] a 'marked' or an 'extreme' limitation in a domain." 20 C.F.R. § 416.926a(e)(4)(i).

On the other hand, in order to have a marked or extreme limitation in a particular domain, it is not necessary for all activities or functions within the domain to be restricted. *See* 20 C.F.R. §§ 416.926a(e)(2)(i), (3)(i). A child may have a marked or extreme limitation "when [the] impairment(s) limits only one activity [within the domain] or when the interactive and

cumulative effects of [the] impairment(s) limit several activities." *Id.* Moreover, multiple

impairments within 1 domain might, together, amount to a marked or extreme limitation even if

no single impairment does so individually. *See* 20 C.F.R. § 416.926a(c). For example, "an

impairment that causes a less than marked limitation in the area of social functioning in addition

to the presence of another less than marked limitation caused by a different impairment may

contribute to the finding of a marked or extreme limitation in the area of social functioning."

*Encarnacion ex rel. George v. Barnhart*, 191 F. Supp. 2d 463, 474 (S.D.N.Y. 2002), *aff'd*, 331

F.3d 78 (2d Cir. 2003).

Although a child needs 2 marked limitations or 1 extreme limitation to qualify for

benefits, "[t]he Act appears to require that each of the claimant's impairments be given at least

some effect during each step of the disability determination process." *Encarnacion*, 331 F.3d at

90. In other words, "each of a child SSI claimant's impairments must be taken into account in

[the Commissioner's] bottom-line assessment of the child's disability." *Id.* at 92.

## FACTUAL BACKGROUND

A.J. and her twin sister were born on April 11, 2005. (Tr. 90, 191). On March 6, 2008,

Johnson applied for SSI benefits on A.J.'s behalf. (Tr. 103). Citing A.J.'s violent behavior,

Johnson alleged that A.J. had become disabled on January 1, 2008. (Tr. 103). Johnson's

application was denied at the initial level. (Tr. 56-59). Johnson then appealed the decision and

attended a hearing before an ALJ on December 3, 2009. (Tr. 27-54, 89). On December 18,

2009, after considering the claim de novo, the ALJ issued a decision finding that A.J. was not

disabled. (Tr. 10-26). On May 27, 2011, the Appeals Counsel denied Johnson's request for

review and the ALJ's decision became the Commissioner's final decision. (Tr. 2-4). This civil

action followed.

**A.      Evidence Prior to the ALJ's Decision**

A.J. was born premature, weighing 4 pounds and 6 ounces.  (Tr. 191, 193-94, 198).  From May 19, 2005, through November 24, 2006, A.J. was treated by pediatrician Norbert Wolloch. (Tr. 219).  According to a questionnaire Wolloch completed on June 24, 2008, Wolloch found A.J. to be "neurologically intact" with full range of motion in her extremities.  (Tr. 221).  He also indicated that her motor skills, sensory abilities, communication skills, cognitive skills, and social and emotional skills were age appropriate.  (Tr. 221-22).  Wolloch noted that A.J. was a "well toddler on November 6, 2006."  (Tr. 219).  He also noted that she fought with her sister and that her prognosis was "very good."  (Tr. 220).

On November 2, 2006, initial service coordinator Kathy Kiernan completed an early intervention program intake form.  (Tr. 212-14).  The intake form indicates that Johnson sought early intervention because A.J. had behavioral problems, including fighting with her sister, biting, and scratching.  (Tr. 212).  Kiernan noted that A.J. was not sleeping at all and that she had good communications skills.  (Tr. 212).  Johnson chose not to pursue early intervention services on November 3, 2006, and A.J.'s case was closed on November 15, 2006.  (Tr. 207).

On June 10, 2008, when she was 3 years old, A.J. underwent a psychological evaluation by certified school psychologist Barbara Kearney in order to have her mental and adaptive developmental status appraised.  (Tr. 175-80).  Kearney reported that A.J. presented as a "distracted child," and had "a great deal of difficulty processing language and focusing on the task at hand."  (Tr. 175).  Although "lack of focus and understanding made the testing very difficult for her," Kearney noted that "[A.J.] was completely at ease with the examiner and a . . . willing participant throughout the testing process."  (Tr. 175).  Her level of eye contact was appropriate and a "rapport was easily established and maintained."  (Tr. 175).  Kearney stated

that A.J.'s verbal responses were given in both words and jargon and that "[m]uch of her communicative intent was not decipherable." Indeed, Kearney noted that A.J. "had difficulty using language to communicate." (Tr. 175). Because of poor focus and difficulty processing language, Kearney stated that A.J. was unable to work independently. (Tr. 175).

Kearney administered a Stanford Binet Intelligence Scales standardized test, in which A.J. received a full scale IQ score of 80 (considered to be in the low average range). A.J. received a non-verbal score of 70 (considered to be borderline) and a verbal score of 91 (considered to be in the average range). (Tr. 176). A.J.'s quantitative reasoning and visual spatial skills were both found to be average. Her fluid reasoning and working memory were borderline, however, and, with a score of 69, her knowledge was considered mildly impaired. (Tr. 176).

Kearney also administered the Vineland Adaptive Behavior Scales standardized test. (Tr. 178). On that test, A.J.'s daily living skills and motor skills were both rated adequate. (Tr. 179). Her communication, however, was considered moderately low with an age equivalent of 2.9 years. Within the communication category, A.J.'s receptive language skills were rated adequate, reflecting an age equivalent of 3.11 years, but her expressive language skills were rated low, with the age equivalent of 2 years. (Tr. 178). A.J.'s socialization was also considered low, reflecting the age equivalent of just 1.11 years. Her adaptive behavior composite score was 74, which was considered to be moderately low. (Tr. 179). Kearney explained A.J.'s low social skills, in part, as reflective of the fact that she was not yet in school and thus had little opportunity to interact with peers. (Tr. 179).

Kearney also completed an educational evaluation in which she observed that A.J.'s general developmental skills clustered around the 2-year-old level. (Tr. 184). She noted that

A.J. used words and jargon to communicate and that her intent was often hard to understand. (Tr. 181). Kearney described A.J.'s language skills as "disordered." (Tr. 182). She noted that A.J. could only briefly attend to picture books, but that, nonetheless, the child could label some body parts expressively and receptively. (Tr. 182). When tested using the Kaufman Survey of Early Academic and Language Skills, A.J. scored above average on her numbers, letters, and words, but "well below average" on her vocabulary. (Tr. 183).

On July 8, 2008, A.J. was evaluated by speech and language pathologist Heather Williams. (Tr. 185-89). Williams noted that A.J. was an "active and friendly child," who presented "with reduced range, strength, and incoordination of the musculature used for speech." (Tr. 185-86). Williams reported that A.J. also presented with "severe receptive language delays and moderate expressive language skills." (Tr. 186). She stated that A.J. spoke with a combination of words, simple phrases, "and strings of unintelligible jargon." Williams administered the Preschool Language Scale 4 ("PLS-4") test "to formally assess both receptive and expressive language skills." (Tr. 188). A.J. obtained an auditory comprehension score of 59, which put her in the 1st percentile and was reflective of an age equivalent of 2.1 years. This score was more than 2.5 standard deviations from the mean. Her expressive communication score was 73, which put her in the 21st percentile with an age equivalent of 2.1 years. That score fell within 1.5 standard deviations from the mean. A.J.'s total score remained low. She scored 62, which placed her in the 1st percentile and was reflective of an age equivalent of 2 years. Williams explained that a child of A.J.'s age should be 80 percent intelligible to all listeners. A.J.'s intelligibility, however, was reduced and informally judged to be approximately 60 percent "in known contexts." It was further reduced in unknown contexts. (Tr. 189).

On July 16, 2008, A.J. was evaluated by licensed clinical social worker Iva Jenkins. (Tr. 254-55). Jenkins recorded A.J.'s social history based on Johnson's report. (Tr. 254-55). Johnson told Jenkins that A.J.'s father had a history of drug use and had been in and out of prison. (Tr. 254). She reported that when A.J. was born, A.J. was in good health and had no digestive or other health issues while she was an infant. (Tr. 254). Johnson reported that milestones occurred "in a timely fashion: [A.J.] sat up at 6 months and walked between 9 and 10 months of age." (Tr. 254). According to Johnson, however, A.J.'s language milestones were delayed. She said that A.J. spoke in short sentences, using gestures and jargon. Johnson also reported that A.J. was "somewhat clumsy." (Tr. 255). Nonetheless, Johnson said A.J. fed herself with a fork and spoon (if clumsily) and could dress herself. She also said that A.J. cooperated with grooming. Johnson was especially concerned about A.J.'s "aggressive behavior" and sibling conflict. (Tr. 255).

Pediatrician Tara Greendyk filled out a report regarding A.J. on July 24, 2008, in which she stated that she treated A.J. regularly from October 2007 through March 25, 2008. (Tr. 302). She diagnosed A.J. with normal growth and development except for excessive sibling rivalry. (Tr. 302). She noted that A.J.'s sensory abilities, communication skills, motor skills, and cognitive skills were age appropriate. (Tr. 304-05).

On January 21, 2009, special education teacher Susan Wolfson filled out a Teacher Questionnaire regarding A.J.'s overall functioning. (Tr. 120-27). She stated that she had known A.J. since September 2008 and had contact with A.J. daily during the child's half-day therapeutic nursery school sessions. (Tr. 120). In the functional domain of "acquiring and using information," Wolfson opined that A.J. had a "slight problem" with reading and comprehending written materials, understanding and participating in class discussions, providing organized oral

8

explanations and adequate descriptions, learning new material, and recalling and applying previously learned material. (Tr. 121). More problematic was A.J.'s ability to comprehend oral instructions, understand vocabulary, and express ideas in written form. Wolfson indicated that A.J. had an "obvious problem" with these activities. (Tr. 121). Finally, she opined that A.J. had a "serious problem" with applying problem-solving skills in class discussions. (Tr. 121). She indicated that A.J. did not have any "very serious problems" in this domain. (Tr. 121).

In the functional domain of "attending and completing tasks," Wolfson opined that A.J. had a "slight problem" with waiting to take turns, changing from 1 activity to another without being disruptive, and completing work accurately without careless mistakes. (Tr. 122). She indicated that A.J. had an "obvious problem" with refocusing on tasks when necessary, carrying out single-step instructions, organizing her own things or school materials, and completing assignments. (Tr. 122). Finally, she noted that A.J. had a "serious problem" with 6 activities: paying attention when spoken to directly, sustaining attention during sports and play activities, focusing long enough to finish tasks, carrying out multi-step instructions, working without distracting herself or others, and working at a reasonable pace and finishing on time. (Tr. 122). Again, she listed no "very serious" problems in this domain.

In the functional domain of "interacting and relating with others," Wolfson indicated that A.J. had "obvious" or "serious" problems playing cooperatively with other children, making or keeping friends, seeking attention appropriately, expressing anger appropriately, following rules, and respecting and obeying adults in authority. (Tr. 123). She had "very serious" problems, however, with respect to 7 activities: asking permission appropriately, relating experiences and telling stories, using language appropriate to the situation, introducing and maintaining relevant and appropriate topics of conversation, taking turns in a conversation, interpreting the meaning

of facial expressions, body language, hints, and sarcasm, and using adequate vocabulary and grammar to express thoughts and ideas in general everyday conversation. (Tr. 123). Wolfson noted that it had been necessary to implement behavior modification strategies for A.J., and that she could understand about one-half to two-thirds of A.J.'s speech. (Tr. 123). Wolfson indicated that A.J. had no problems in the functional domain of "moving about and manipulating objects." (Tr. 123).

The last functional domain Wolfson considered was "caring for herself." She opined that A.J. had "slight" or "obvious" problems with taking care of personal hygiene, caring for physical needs, and using good judgment regarding personal safety and dangerous circumstances. (Tr. 125). She indicated that A.J. had "serious" problems with handling frustration appropriately, being patient, identifying and appropriately asserting her emotional needs, responding appropriately to changes in her own mood, using appropriate coping skills to meet daily demands of the school environment, and, finally, asking for help. (Tr. 125).

On February 2, 2009, Wolfson completed a "regression statement" indicating that during the holiday period, A.J. lost competencies or knowledge with respect to the ability to follow her teachers' direction, pay attention to ongoing activities, and use socially appropriate language and social behavior. (Tr. 153-54). She reported that it took A.J. 2 weeks to reestablish the skills and competencies she had lost. (Tr. 153-54). In the statement, Wolfson described A.J. as a friendly, but moody child. She stated that A.J. was self-directed but had difficulty following directions and going with the flow. Although she was capable of understanding the classroom schedule and routines, Wolfson reported that she often refused to follow teacher directives. (Tr. 153-54). Wolfson stated that A.J. exhibited defiant behavior, often throwing tantrums when directed to a task not of her own choosing. (Tr. 153-54). A.J. did better in 1-on-1 situations with teachers

than she did in group activities, and Wolfson stated that that she enjoyed or excelled in fine motor activities, like beads and puzzles. (Tr. 153-54). Wolfson noted that, although A.J. was highly distracted, she had been helping the teacher conduct certain activities and that the structured classroom had enabled her to gain confidence in language, cognitive, and social and emotional skills. (Tr. 153-54).

Two days later, Wolfson completed a progress report in which she noted that A.J. was easily distracted and was difficult to understand due to language delays. (Tr. 155-57). But she described A.J. as showing "more confidence in her language" and "using her words more." (Tr. 155). She also reported that over the last 2 months, "she has become much friendlier with both children and teachers." (Tr. 155). Wolfson again noted that A.J. had difficulty following directions or being redirected without having a tantrum that could last up to 20 minutes. But she explained that, "of late" A.J. had begun to "eagerly participate in circle time," and that she had begun to make friends in the class. (Tr. 155).

In terms of cognitive functioning, Wolfson reported that A.J. could attend a task or story in a small group for 5 minutes if she had assistance. A.J. could complete 35-piece puzzles with some assistance, and she could also repeat 3-digit sequences and recall familiar objects. However, she was unable to locate hidden items in pictures or recall facts from an oral story without difficulty. (Tr. 155). While A.J. could identify the colors of familiar objects not in view, sort forms by shape and size with demonstration, and identify the longer of 2 objects, as well classify and name objects, she had difficulty sequencing familiar events in a logical order and was unable to complete opposite analogies. According to Wolfson, A.J. recognized most letters of the alphabet but was only beginning to recognize the numbers 1 through 10. (Tr. 155). A.J. could express her needs and wants to both adults and peers in the classroom, but was a shy

participant in conversations.  Nonetheless, Wolfson reported that A.J. could be "very animated and humorous" and that she enjoyed an audience.  She stated that A.J. responded appropriately to questions that begin with the words "what," "who," and "where," and was able to associate spoken words with pictures.  While she could establish eye contact, she could not maintain it.  Her overall speech was delayed.  (Tr. 155).

Wolfson noted that A.J. greeted familiar adults "spontaneously if her mood allows," and responded positively when adults initiated social contact.  (Tr. 155).  Although she had temper tantrums when she did not get her way, Wolfson reported that she was learning to take turns and share and that she showed pride in her accomplishments.  (Tr. 155).  A.J.'s physical development, including her fine and gross motor skills, remained age appropriate.  (Tr. 157).  In summary, Wolfson noted that A.J. had shown progress but continued to have difficulty with her pragmatic and social and emotional skills.  (Tr. 157).

In an annual review conducted on February 23, 2009, Jenkins reported that A.J.'s lack of expressive language interfered with her development of social skills.  Nevertheless, she indicated that "slow progress" was being made in A.J.'s ability to relate to others and to assert herself without aggression.  (Tr. 159).

On February 25, 2009, Williams reported, similarly, that A.J. had made "slow, but steady progress towards speech-language goals."  (Tr. 158).  A.J. was able to follow 2-step commands given some repetition.  She had also improved her vocabulary and was able to answer simple questions with cues and models.  (Tr. 158).  Nonetheless, she continued to have difficulty maintaining topics and taking turns.  Moreover, topics were limited to her immediate environment.  Williams noted that A.J.'s speech intelligibility remained reduced and her oral

motor skills were a subject for concern. (Tr. 158). Williams recommended continued speech language services due to A.J.'s "severe delays across all domains of language." (Tr. 158).

Wolfson completed another questionnaire regarding A.J.'s functionality on July 23, 2009. (Tr. 144-50). In the functional domain of "acquiring and using information," Wolfson indicated that A.J. had "marked or serious difficulties" repeating her home address and tying her shoes. She indicated that A.J. had "some difficulties" listening to stories, understanding words about space and time, rhyming words, recalling prior lessons, counting and sorting shapes, painting, coloring, using scissors, and recognizing colors, shapes, and numbers to 10, as well as reciting words to her favorite song. (Tr. 144-50). Wolfson noted that A.J. had difficulty when she did not get her way in the classroom and when she became verbally frustrated. (Tr. 144-50).

In the functional domain of "interacting and relating with others," Wolfson noted that A.J. had "marked or serious difficulties" in initiating and participating in conversations using increasingly complex grammar, and in speaking clearly enough to enable unfamiliar listeners to understand what she said most of the time. (Tr. 146). She also indicated that A.J. had "some difficulties" with 9 activities including the abilities to socialize, relate to caregivers with increasing independence, share, and sustain interpersonal contact. (Tr. 146). Wolfson noted that A.J. could be pleasant much of the time but had negative behavior that impeded her development. (Tr. 146).

Wolfson reported that A.J. was "showing some progress" in the domain of "attending and completing tasks," noting that A.J. was "an expert puzzle solver." (Tr. 147). She indicated that A.J. had marked or serious difficulties with only 1 activity in that domain: the ability to tolerate frustration. (Tr. 147). Nonetheless, she reported that A.J. still had some difficulties with the

remaining activities, including perseverance and the ability to initiate and complete activities, to maintain focus, and to attend to a speaker when spoken to directly.  (Tr. 147).

In the domain of "caring for herself," Wolfson indicated that there were 2 areas in which A.J. had "extreme or very serious difficulties": self-soothing and willingness to be consoled when sad.  (Tr. 148).  She opined that A.J. had "some difficulties" demonstrating emotion and controlling dangerous or unsafe behavior.  (Tr. 148).  She reported that A.J. had "no difficulties" with the other 8 activities, including sense of humor, engaging in self-injurious behavior, taking care of her own needs, and assisting in dressing herself, brushing her teeth, combing her hair, and putting on her jacket.  (Tr. 146).

Wolfson reported that A.J. had shown progress in the domain of "moving about and manipulating objects," and stated that she was "becoming a little more independent as well." (Tr. 149).  She indicated that A.J. had no difficulties in any of the categories, other than being able to manipulate buttons and zippers.  (Tr. 149).  In the functional domain of health and physical well being, Wolfson noted that A.J. presented as a "healthy little girl."  She opined that A.J. had some difficulties requiring adult attention and with missing important events due to physical or emotional difficulties, but no difficulties with any other activities in this domain.  (Tr. 150).

Wolfson completed a similar questionnaire on October 26, 2009.  (Tr. 328-34).  She noted in the questionnaire that A.J. was progressing slowly in the functional domain of "acquiring and using information."  (Tr. 329).  She indicated that A.J. had "marked or serious difficulties" repeating her home address and describing her family routines in detail.  She also had "some difficulties" listening to stories, rhyming words, and recognizing her own name in script.  She had "no difficulties" with the remaining 8 activities.  (Tr. 329).

In the functional domain of "interacting and relating with others," Wolfson wrote that A.J. had "shown some progress," but that the "domain remain[ed] a difficult skill for her," for which she required a lot of support.  (Tr. 330).  Wolfson indicated that A.J. had "no difficulties" relating to caregivers or preferring same-age playmates.  She had "some difficulties," however, with the remaining 10 activities, including using words instead of actions to express herself, initiating and sustaining interpersonal contact, and showing affection spontaneously.  (Tr. 330).

According to Wolfson, although A.J. had shown some progress in the domain of "attending and completing tasks," it remained difficult for her and she required "support and redirection."  (Tr. 331).  She showed "marked or serious" difficulties tolerating frustration and taking turns and changing activities when appropriate.  (Tr. 331).  Although she had "no difficulties" concentrating on activities like puzzles, she had "some difficulties" with the remaining 9 activities.  (Tr. 331).

In the functional domain of "caring for herself," Wolfson noted that A.J. had "shown progress," and continued "to try to be more independent."  (Tr. 332).  She still showed "extreme or very serious" difficulties in the use of self-soothing activities.  (Tr. 332).  She had "some difficulties" with assisting in dressing and other personal hygiene, engaging in self-injurious behavior, controlling dangerous behavior, willingness to be consoled, and demonstrating emotions such as joy, sadness, worry, fear, and hope.  She had "no difficulties" with the remaining 5 activities.  (Tr. 332).

Wolfson indicated that A.J. had "no difficulties" in any of the 13 activities in the "moving about and manipulating objects" domain, noting that A.J. was "excelling nicely."  (Tr. 333).  Similarly, she noted "no difficulties" for A.J. in the "health and physical well-being" domain, noting that it was a strength of A.J.'s.  (Tr. 334).

15

**B.      Consulting Medical Evidence**

When A.J. was 39 months old, she was examined by physician Tomasito Virey.  (Tr. 224-29).  Virey noted that A.J. was born premature and that she had "psychiatric issues, hyperactivity, [and] violent issues."  (Tr. 224).  He also diagnosed her with a learning disability and speech and language problems and noted that she was awaiting the start of speech therapy and special placement in a preschool.  (Tr. 224).  A.J. was in the 97th percentile for both height and weight and appeared to Virey as well developed, well nourished, alert, and active.  He reported that her cognitive functioning level was less than expected for her age, and that she had difficulty pronouncing some words.  (Tr. 226).  Virey also diagnosed A.J. with a heart murmur.  Her prognosis was fair.  In his medical source statement, he reported that A.J. could "participate in age-appropriate educational, social, recreational, and physical activities as long as she follow[ed] up with the psychotherapist, behavioral therapist . . . and also speech therapy and special education placement."  (Tr. 228).

In July 2008, pediatrician Dr. D. Bostic and psychologist J. Dambrocia reviewed A.J.'s records and assessed her functionality.  (Tr. 296-301).  They summarized her impairments as consisting of an asymptomatic heart murmur, speech language delays, and behavioral difficulties, and sought to rule out a learning disability.  (Tr. 296).  They indicated that those impairments, while severe, did not meet, medically equal, or functionally equal the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 296).  Bostic and Dambrocia opined that A.J. had a less than marked limitation in 4 of the 6 functional domains: "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and "caring for herself." In the remaining 2 domains — "moving about and manipulating objects" and "health and physical well-being" — A.J. was found to have no limitations.  (Tr. 298-99).

## C.     The Hearing and the ALJ's Decision

At the hearing held in December 2009, Johnson testified that she did not experience any problems with A.J. until A.J. was almost 1 year old, when A.J. pushed her sister off the bed, breaking her sister's arm.  (Tr. 37).  Johnson stated that A.J. was still having difficulties, but that "the preschool is helping, is really helping a lot."  (Tr. 43).  Johnson opined that A.J. was able to count from 1 to 10 and that she knew a few numbers.  Johnson testified that A.J. still fights with her sister violently but only occasionally with other children and that, with other children, it is merely arguing.  (Tr. 44).  Johnson stated that A.J.'s teacher had never told Johnson that A.J. had any problems with other children in the class.  (Tr. 48).  Johnson reported, further, that A.J. had a problem with tantrums and prolonged periods of crying.  (Tr. 49).  She stated that such tantrums used to occur every day, but that they have gotten a little better and only occurred 2 or 3 times a week at the time of the hearing.  (Tr. 50).

In his decision, the ALJ considered and weighed the evidence in the record, evaluating how A.J. functioned "in all settings and at all times, as compared to other children the same age who do not have impairments."  (Tr. 17).  The ALJ considered the fact that A.J. attended a therapeutic nursery program, the testimony of A.J.'s mother about A.J.'s behavior at home, and the various evaluations that were conducted both inside and outside of a schoolroom setting.  (Tr. 18-20, 23).  The ALJ found that A.J. had no limitations in the functional domains of moving about and manipulating objects, and caring for herself, other than an inability to self-soothe.  (Tr. 25-24).  The ALJ also found that A.J. had no limitation in the domain of her own health and physical well being, and a less than marked limitation in the domain of attending and completing tasks.  (Tr. 50).  Although A.J. had shown significant progress in her interacting skills, the ALJ found that A.J. had a marked limitation in interacting and relating with others.  (Tr. 23).  He

based this finding on A.J.'s "history of intense fighting and rivalry with her twin sister." (Tr. 23).

The ALJ considered other "day-to-day evidence" of functioning, noting that A.J. had a Full-Scale

IQ of 80, reflective of low average intellectual functioning. He also noted that although A.J. had

speech and language deficits, she had improved in these areas since enrolling in school, and he

concluded that A.J. had a less than marked limitation in acquiring and using information. (Tr.

19-21).

After considering all the evidence, the ALJ determined that despite A.J.'s "severe"

developmental delays, she did not have an impairment or combination of impairments that met

or equaled, medically or functionally, a listed impairment in 20 C.F.R. Part 404, Subpart P,

Appendix 1. He therefore concluded that A.J. was not disabled under the Act. (Tr. 26).

**D.      Evidence After the ALJ's Decision Was Issued**

After the ALJ issued his decision, Johnson submitted an additional report from Wolfson

to the Appeals Council, dated May 19, 2010. (Tr. 135). At the time the report was written, A.J.

was 4.1 years old. (Tr. 135). In the report, Wolfson noted that A.J. received speech therapy and

counseling twice weekly. Wolfson further reported that A.J. was shy until she gained the trust of

adults or peers, whereafter she became friendly. Nonetheless, Wolfson stated that A.J. could be

"extremely moody" and "oppositional." (Tr. 135). Wolfson further noted that A.J. "had

blossomed" that year and "become much more confident and clearer in her use of language."

(Tr. 135). She stated that A.J. had also become much friendlier with children and teachers and

was well liked. (Tr. 135).

Wolfson repeated the comments mentioned in earlier reports that A.J. had difficulty

following directions and the flow of the classroom. (Tr. 135). She mentioned again that A.J. had

trouble transitioning from activities of her choice and was apt to have tantrums lasting up to 20

minutes, perhaps due in part to her continued inability to self-soothe. (Tr. 135). Nonetheless, Wolfson reported that A.J. had "begun to eagerly participate during circle time and enjoy[ed] pretending she is the teacher." (Tr. 135). A.J. would answer questions and would "remind the teacher what comes next in the routine." (Tr. 135). Wolfson stated that A.J. "still had difficulty with play skills," but that she was beginning to understand the concepts through the use of guided play and modeling. (Tr. 135).

In a letter dated August 5, 2010, Wolfson explained that she had been working with A.J. and her sister in a structured classroom setting with a ratio of 8 children to 1 teacher and 1 paraprofessional. (Tr. 336; Mem. Law 23). She said some progress had been made in the girls' emotional and social skills, but that they still showed little progress in self-soothing. (Tr. 336). Wolfson explained that although their interpersonal skills showed improvement, they would argue when playing together and could become "quite aggressive." (Tr. 336). She stated that "self directedness as well as interfering behaviors impeded their overall development." (Tr. 336). Wolfson recommended further evaluation and that services be maintained to help the girls become more independent. (Tr. 336).

**STANDARD OF REVIEW**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court may set aside the Commissioner's determination that a claimant is not disabled, however, "only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)) (internal quotations marks omitted). "Substantial

evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447

(2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "It

means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a

conclusion." *Id*. at 447-48 (internal quotation marks omitted). It is a "very deferential standard

of review — even more so than the 'clearly erroneous' standard." *Id.* at 448 (citing *Dickinson v.*

*Zurko*, 527 U.S. 150, 153 (1999)). Once the ALJ finds facts, the Court can only reject them if "a

reasonable factfinder would *have to conclude otherwise*." *Id.* (quoting *Warren v. Shalala*, 29

F.3d 1287, 1290 (8th Cir. 1994)).

The inquiry is based on the entire administrative record, including any new evidence

submitted to the Appeals Council following the ALJ's decision. *See Perez v. Chater*, 77 F.3d 41,

45 (2d Cir. 1996); *see also* 20 C.F.R. § 404.970(b) (allowing a claimant to submit "new"

evidence to the Appeals Council); *id.* § 416.1470(b) (same). This is the case even where, as here,

the Appeals Council denies review of the ALJ's decision and the ALJ's decision is therefore the

Commissioner's final decision for purposes of judicial review. *See Perez*, 77 F.3d at 44-45. That

is because "when the Appeals Council denies review after considering new evidence, the

[Commissioner's] final decision necessarily includes the Appeals Council's conclusion that the

ALJ's findings remained correct despite the new evidence." *Id.* at 45 (internal quotation marks

omitted). Thus, when, as in this case, the Appeals Council denies review after considering new

evidence, the Court "simply review[s] the entire administrative record, which includes the new

evidence, and determine[s], as in every case, whether there is substantial evidence to support the

decision of the [Commissioner]." *Id.* at 46.

**DISCUSSION**

Agreeing with the ALJ's finding that A.J. has a marked limitation in the functional domain of "interacting and relating with others," Johnson argues first that the ALJ erred in not also finding that A.J. has a marked limitation in the "acquiring and using information" domain. (Mem. Law 19). The principal evidence she marshals in support of her claim is A.J.'s score on the PLS-4 test. (*Id.* at 20). A.J.'s total language score on that test was 62 with an age-equivalent of 2 years, placing her in the 1st percentile, which reflects more than 2 standard deviations below the mean. Johnson argues that these scores "clearly reflect a 'marked' limitation in the use of language," and support finding a marked limitation in the domain of acquiring and using information. (*Id.* (citing *McClain v. Barnhart*, 299 F. Supp. 2d 309, 325 (S.D.N.Y. 2004) ("A score at or below the first percentile satisfies the SSA's regulatory definition of a marked limitation, since the bottom 2.3 percent of any population is more than two [standard deviations] below the mean."))).[1]

In addition to the PLS-4, Johnson cites Wolfson's opinions and reports from 2008 to 2009 indicating that A.J.'s speech intelligibility was fair to poor, that she had "serious" limitations following oral instructions and understanding vocabulary, and "very serious problems" applying problem solving skills in class discussions. (*Id.* at 21). She also appeals to Wolfson's July 2009 and October 2009 questionnaires in which she noted A.J.'s marked and near marked limitations in tasks such as repeating her home address, tying her shoes, describing family routines, listening to stories, and using words to ask questions. (*Id.*).

---

[1]     Although many activities associated with language fall within the "interacting and relating with others" domain, "a child's problems with speech and language . . . need to be assessed in both the 'acquiring and using information' domain and the 'interacting and relating with others' domain." *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 489 (E.D.N.Y. 2003).

Despite this evidence, however, there was in fact substantial evidence to support the Commissioner's decision.  Although A.J. scored between 2 and 3 standard deviations below the norm on the PLS-4, this, by itself, is not sufficient to require an ALJ to make a finding that a child has a marked limitation in a domain.  The regulations state that such a score shows a marked limitation only if the child's "day-to-day functioning in domain-related activities is consistent with that score."  20 C.F.R. § 416.926a(e)(2)(iii).  Thus, as long as there was sufficient evidence for the ALJ to conclude that A.J.'s day-to-day functioning was not consistent with her score on the PLS-4, her performance on that test was not dispositive.[2]

In concluding that A.J. has a less than marked limitation in "acquiring and using information," the ALJ noted that A.J. achieved a Full-Scale IQ of 80, "which is reflective of low average intellectual functioning."  (Tr. 21).  He admitted that A.J. had "speech and language deficits," but noted that improvement had been made since she enrolled in school.  (Tr. 21).  Indeed, in 2009, speech pathologist Heather Williams reported that A.J. had "made slow, but steady progress towards [her] speech-language goals."  (Tr. 158).  Although Johnson notes that Williams also reported that A.J. still had "severe delays across all domains of language" (Reply Mem. 6), this is not inconsistent with her opinion that A.J. had generally shown improvement.

Wolfson's reports also support the ALJ's finding that A.J. did not have a marked limitation in the "acquiring and using information" domain.  For example, in her July 2009 questionnaire, she indicated that A.J. had only "some difficulties" in 10 of 12 activities related to acquiring and using information.  (Tr. 145).  She had "marked or serious difficulties" only in her ability to repeat her own address and tie her shoes.  (Tr. 145).  3 months later, Wolfson's

---

[2]  Moreover, even if A.J.'s score, by itself, constituted grounds for finding a marked limitation in the use of language, there would still be the further question of whether that showed a marked limitation in the "acquiring and using information" domain or in the "interacting and relating with others" domain.  The Court need not and does not reach that question.

questionnaire indicated that A.J. had improved significantly such that she no longer had any difficulties at all in 8 of the 12 activities in the relevant domain. Again, she had "marked or serious" difficulties in only 2 of the activities. (Tr. 329). Wolfson noted that A.J. was "progressing slowly." (Tr. 329). In the related domain of "interacting and relating with others," Wolfson indicated that A.J. only had "some difficulties" initiating and participating in conversations using increasingly complex vocabulary and grammar, using words instead of actions to express herself, and speaking clearly enough so that unfamiliar listeners could understand what she said most of the time. (Tr. 330).

Further supporting the ALJ's decision is the evidence in the record from A.J.'s treating pediatrician, Dr. Greendyk, and from Drs. Bostic and Dambrocia. Dr. Greendyk opined that A.J.'s communication skills and cognitive skills were age appropriate. (Tr. 305). Similarly, Drs. Bostic and Dambrocia reviewed A.J.'s record and concluded that A.J. had a "less than marked" limitation in the domain of "acquiring and using information." (Tr. 298, 300).

To be sure, there is evidence in the record supporting Johnson's contention that A.J. has a marked limitation in the "acquiring and using information" domain. But the Court's task, here, is not to "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Florencio v. Apfel*, No. 98 Civ. 7248, 1999 WL 1129067, at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.). If, as here, the ALJ's decision was based on substantial evidence, and correct legal principles were applied, this Court must affirm the Commissioner's final decision even if the record contains contrary evidence. *See, e.g.*, *Betances v Bernhart*, No. 03 Civ. 6440 (AKH), 2005 WL 957366, at *4 (S.D.N.Y. Apr. 25, 2005) ("If the Court finds that there is substantial evidence for the determination, the Commissioner's

decision must be upheld, even if there is substantial evidence for the Plaintiff's position as well." (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

Johnson also argues that the ALJ erred by failing to factor in the effects of highly structured settings, as required by the Commissioner's regulations. (Mem. Law 22). Johnson calls the Court's attention to the fact that even if A.J. is able to adequately function in a structured or supportive setting, the Commissioner "must consider how [A.J.] function[s] in other settings and whether [A.J.] would continue to function at an adequate level without the structured or supportive setting." 20 C.F.R. § 416.924A(B)(5)(IV)(C). Johnson argues that the ALJ "failed to acknowledge the policy requiring him to consider the effects of structured settings and failed to apply that policy when assessing the severity of A.J.'s case. It appears that the ALJ was simply unaware that he was obligated to assess A.J.'s functioning outside of the highly structured classroom." (Mem. Law 23).

As an initial matter, the ALJ was indisputably aware that A.J. was in a structured setting. For example, he notes in his opinion that A.J. was enrolled in a "therapeutic nursery school with speech and language and counseling services." (Tr. 19). He later states that A.J. was progressing slowly in "a self-contained classroom" and that she received "intervention services." (Tr. 19-20). Additionally, it cannot be said that the ALJ considered *only* evidence involving A.J.'s structured classroom setting. After all, he stated that he had given "careful consideration" to the "entire record" (Tr. 17), which contains evidence regarding A.J.'s functioning outside the classroom, including her behavior at home, A.J.'s social history as reported to Jenkins, and various evaluations by physicians outside the classroom setting. (Tr. 18-20, 23, 28-54, 254-55, 296-306). Further, the ALJ explicitly stated that he had "evaluated how the child functions *in all settings and at all times*, as compared to other children the same age who do not have impairments." (Tr.

17 (emphasis added)).  He explained that in evaluating A.J.'s limitations, he "considered the type, extent, and frequency of help [she] needs to function."  (Tr. 17).

Finally, as the Commissioner notes in his submissions to this Court, Johnson "does not point to any evidence that states that [A.J.'s] functioning is worse outside [the schoolroom setting], and there was little evidence that A.J. displayed markedly worse or different functioning outside of the classroom, except insofar as she interacted more directly with her twin sister." (Opp'n Mem. Law 20-21).  Thus, there was little reason for the ALJ to explicitly discuss structured settings in his opinion.  Nor was he required to explicitly discuss it.  Although an ALJ is required by regulation to consider the factors related to functioning in a supportive and structured setting, that "regulation does not command the ALJ to *explicitly* discuss his consideration."  *Shatraw ex rel. K.C.Y. v. Astrue*, 7:11-CV-13 (GLS), 2012 WL 589667, at *4 (N.D.N.Y. Feb. 22, 2012) (quoting *Watson ex rel. K.L.W. v. Astrue*, No. 07-CV-6417T, 2008 WL 3200240, at *5 (W.D.N.Y.  Aug. 5, 2008)) (emphasis added).

## CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal principles, that his decision was supported by substantial evidence, and that the Commissioner's final decision should be upheld.  Accordingly, Plaintiff's motion for judgment on the pleadings is DENIED and Defendant's motion for judgment on the pleadings is GRANTED.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:  March 22, 2013
        New York, New York

_____
JESSE M. FURMAN
United States District Judge

25